Filed 11/16/23  Lee v. Ryoo CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| YEO BAI LEE, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> CHRISTY JIHEE RYOO et al., <br><br> Defendants and Respondents. | H050465 <br> (Santa Clara County <br> Super. Ct. No. 21CV386912) |

Plaintiff and appellant Yeo Bai "Joe" Lee (Joe)[1] appeals from an order denying his motion to disqualify attorney Mark Adams (Adams) and Adams's law firm Jeffer Mangels Butler & Mitchell (JMBM) from representing defendant and respondent Christy Jihee Ryoo (Ryoo)[2] in this breach of contract, fraud, and financial elder abuse case.

---

[1] For clarity, we refer to parties who share a last name by their first names as they appear in the briefs and record.  (See, e.g., *In re Marriage of Leonard* (2004) 119 Cal.App.4th 546, 550, fn. 2.)

[2] The complaint also names defendants K & L Supply Korea Co., Ltd. (K & L Korea), K & L Supply Co., Inc. (K & L Supply), YBL Holdings, Inc., and Skylars LLC (together, entity defendants).  The entity defendants are pleaded as nominal defendants only and, according to Joe, are necessary parties because he seeks receiverships and a constructive trust over them.  We refer to the entity defendants and Ryoo together as "respondents."

Joe maintains that Adams improperly solicited privileged and confidential information about Joe from Jim Ryan (Ryan), Joe's attorney of record in another matter. Ryan's communications with Adams culminated in Ryan's submission of a signed declaration. That declaration, which Adams sought to file in support of a posthearing request to file sur-reply evidence, explained Ryan's prior representations of Joe and his interactions with the parties and issues in this case. Joe suggests that Ryan "switched sides" to support Ryoo against his own client, Joe, because Ryan had begun a romantic relationship with Ryoo that he did not disclose to Joe. Joe contends that by facilitating Ryan's unethical conduct and using Ryan as a witness against Joe, Adams made Ryan his de facto cocounsel or "of counsel" to JMBM. Joe argues this relationship required the trial court to impute Ryan's conflict of interest to Adams and JMBM.

The trial court denied the disqualification motion. It found there was no substantial evidence that Adams had procured or obtained privileged or confidential information from Ryan. It further found that Joe had not demonstrated a legal or factual basis to disqualify either Adams or JMBM based on the alleged misconduct of Ryan.

On appeal, Joe contends the trial court erred by failing to apply the rules of imputed conflict of interest and vicarious disqualification. In response, Ryoo maintains the appeal should be dismissed as moot because Joe has waived his attorney-client privilege with Ryan. In the alternative, Ryoo asserts that Joe's disqualification theories are legally meritless and factually unsupported. We also consider whether the appeal is moot because neither Adams nor JMBM currently represents respondents.

Having considered the record before the trial court and its factual findings, we deny respondents' motion to dismiss the appeal, decide it is not moot, and affirm the trial court's order.

# I. FACTS AND PROCEDURAL BACKGROUND[3]

A. *The Parties and Prior Litigation*

Joe was born in North Korea and came in 1963 to the United States, where he has built several successful companies. Joe and his then-wife Hee Ja Lee (Hee Ja), founded K & L Supply, a motorcycle and auto parts design, manufacturing, and supply company. During his lengthy tenure at K & L Supply, Joe was the company president and Hee Ja was the secretary. Joe and Hee Ja have one biological daughter, Julia Lee (Julia).

Ryoo, who is fluent in Korean and English, was born in Korea and immigrated to the United States in 1988 when she was 17 years old. After graduating from college, Ryoo became a licensed chiropractor and practiced full time from 2002 until approximately 2015. Ryoo met Joe early in her practice when he was referred to her for chiropractic care. She treated him for a short time, then again in 2012 and 2013. During that time, Joe began confiding in Ryoo about his pending divorce with Hee Ja. Joe and Ryoo became emotionally close.

In 2013, Ryoo became Joe's personal assistant and interpreter. Joe was embroiled in multiple lawsuits, including divorce proceedings against Hee Ja, civil litigation against Hee Ja over the ownership of K & L Supply, and a conservatorship action filed by Julia in 2014.

Ryan represented Joe as trial counsel in the 2014 civil case between Joe and Hee Ja over the control of K & L Supply. Ryan also served as Joe's counsel in the 2014 conservatorship action brought by Julia, which involved allegations that Ryoo exercised undue influence over Joe. Ryan also was Joe's trial counsel in what became a combined

---

[3] We grant appellant's unopposed request for judicial notice in support of his opening brief (filed Feb. 6, 2023). The request for judicial notice comprises Joe's complaint in this action (filed Sept. 15, 2021), which it appears was inadvertently omitted from the clerk's transcript, and Joe's petition for writ of mandate in this court (filed Oct. 7, 2022), which this court summarily denied on January 12, 2023. (Evid. Code, §§ 452, subd. (d)(1), 453, 459.)

3

divorce and civil action between Joe and Hee Ja. The combined divorce and civil action settled after mediation in June 2021 and ended in a final judgment filed in May 2022. Ryan served as trial counsel in that action both for Joe individually and for entity defendants K & L Supply and K & L Korea.

In 2016, Joe made Ryoo an employee of entity defendant YBL Holdings, Inc. She also became the chief financial officer of K & L Supply. In 2018, Joe legally adopted Ryoo as his daughter.

In a series of transactions over several years, Joe transferred to Ryoo complete ownership of the entity defendants and of several real estate holdings. Ryoo also held power of attorney for Joe from 2018 until June 2021, when Joe suffered a stroke and was diagnosed as having impaired mental capacity.

In September 2021, Joe executed a durable power of attorney authorizing his longtime friend and neighbor Steve Scialabba to act as his agent/attorney-in-fact. Scialabba retained counsel and filed this action. Joe was then 88 years old.

In November 2021, Joe transferred the power of attorney to his daughter Julia.

*B. Current Elder Fraud Suit*

In September 2021, through counsel retained by Scialabba, Joe filed the operative complaint. The complaint alleges that Ryoo preyed on Joe's vulnerabilities, persuaded him to transfer all his assets to her (which she claimed she would hold for his benefit), and eventually removed Joe from the officer and director positions he had held, making herself the sole shareholder, officer, and director of K & L Supply and YBL Holdings, Inc. The complaint asserts numerous claims against Ryoo, including breach of oral contract, intentional infliction of emotional distress, fraud, elder abuse, and conversion. It seeks the appointment of a receiver and imposition of a constructive trust against the entity defendants.

Shortly after the filing of the complaint, the trial court granted Joe's request for a temporary restraining order pending a November 3, 2021 hearing on the motion for

4

preliminary injunction to bar Ryoo from any transfer or sale of interest in the entity defendants or real estate properties. After the November 3 hearing, respondents filed a posthearing application to file sur-reply evidence and argument. Respondents' briefing filed in support of the posthearing application to file sur-reply evidence and argument included a declaration by attorney Ryan (hereafter, Ryan declaration). This declaration forms the basis of Joe's motion for disqualification of Adams and JMBM.

The Ryan declaration states that Ryan attended the November 3 hearing on the motion for preliminary injunction and heard Joe's counsel make "a number" of "inaccurate" statements. The Ryan declaration details Ryan's representation of Joe in various matters, clarifies Ryoo's role as a translator for Ryan in his attorney-client communications with Joe, describes occurrences after the June 2021 mediation and settlement when Joe suffered a stroke and hospitalization, summarizes Ryan's communications starting in 2016 with Joe's friend Scialabba about Scialabba's concern that Ryoo was taking advantage of Joe, and expresses skepticism about Joe's allegations against Ryoo.

The trial court ultimately denied respondents' application to file sur-reply evidence and argument (including the Ryan declaration), granted the preliminary injunction requested by Joe, and ordered Joe to post bond as a condition of injunctive relief.

## C. Disqualification Motion

Counsel for Joe responded to the Ryan declaration by lodging a State Bar complaint against Ryan and issuing deposition subpoenas for business records to both Ryan and JMBM regarding their communications about the Ryan declaration. JMBM objected to the deposition subpoena and submitted, in support of its objections, a privilege log consisting of 102 entries from October 22, 2021, through January 20, 2022. All of the entries list either e-mail or e-mail attachments "of attorney communications regarding dispute" between Ryan and Adams.

5

In April 2022, Joe filed a motion to disqualify JMBM from representing Ryoo and the entity defendants (hereafter, motion).[4] The disqualification motion came before a different bench officer than the judge who had ruled on the earlier motion for preliminary injunction.

In support of the motion, Joe asserted that JMBM colluded with and obtained confidential information from Ryan while Ryan was still representing Joe as his counsel of record in the divorce action. Joe also asserted that Ryan was "romantically involved with [Ryoo]." Joe argued that in procuring Ryan's assistance, JMBM "aided and abetted Ryan's violation of his most sacrosanct fiduciary obligations to Joe—undivided loyalty and maintaining Joe's confidences." Joe argued that JMBM was "irreparably tainted" in the case and that to allow the firm to remain as counsel would violate public trust in the scrupulous administration of justice and the integrity of the bar, a paramount consideration in disqualification motions.

Joe specifically asserted three grounds for disqualification of JMBM and Adams: First, that Adams knowingly solicited confidential information from Ryan and actively promoted Ryan's breach of the duty of loyalty by attempting to file the Ryan declaration; second, Ryan should be treated as *de facto* cocounsel to Adams and, under the imputed knowledge rule, his knowledge must be imputed to JMBM; and third, that as demonstrated by the assertions of privilege in the JMBM privilege log, the firm misused confidential information in violation of its ethical obligations.

In opposition, respondents argued "there cannot be a disqualifying conflict" because Adams neither represented Joe nor was adverse to him at any time before Adams began representing Ryoo and the entity defendants. Respondents asserted that Joe's

---

[4] Respondents concurrently filed their own motion to disqualify the law firm representing Joe, on the ground that two of the firm's attorneys have disqualifying conflicts of interest due to their longstanding and ongoing representation of Hee Ja in the divorce action with Joe. The trial court denied that motion, and it is not at issue in this appeal.

6

motion lacked legal or factual support and relied entirely on speculation in its assertion that Ryan had disclosed confidential information to Adams. They pointed out that Joe had not challenged JMBM's assertion of evidentiary privileges (i.e., work product protection) over Adams's communications with Ryan and argued that Joe's motion conflated Adams's proper use of the evidentiary privilege with the adverse interest principles that guide disqualification decisions.

Respondents filed two declarations in support of their opposition to the motion. The Adams declaration described Adams's engagement in the case as counsel for Ryoo and the entity defendants and the basis for Adams's communications with Ryan. Adams stated that Ryoo and the entity defendants retained him shortly after Joe filed the complaint in this case, and prior to his retention he had no knowledge of or involvement with any of the parties or the various lawsuits. Adams explained that he contacted Ryan, whom he learned had "been involved as counsel in one or more of the prior proceedings," as part of an effort to understand the tangled family and business relations that had been litigated over the course of the prior decade. Adams stated that he also spoke with Ryan about issues relating to the entity defendants based on his understanding that Ryan previously represented K & L Supply and K & L Korea, and "continues to represent K & L Supply," such that any communications between them relating to the K & L entities are "independently covered by the attorney-client privilege." Adams described the privilege log submitted by JMBM following its objections to Joe's subpoena for business records. He asserted that he never asked Ryan to provide any information that Ryan "had learned on a confidential basis" from Joe and that Ryan "has never told me about any of the communications between him and [Joe]."

Ryoo also submitted a declaration providing basic background facts relating to her relationship with Joe, the retention in 2021 of Ryan to represent K & L Supply and K & L Korea in the civil litigation brought by Hee Ja, and the conflict waivers that she

7

and Joe signed in that representation. Ryoo stated that Ryan "continues to represent K & L Supply at the present time."

In reply, Joe argued that Adams's lack of any prior adverse relationship with Joe was a "strawman" argument because, under the circumstances, "courts *impute* the knowledge of the tainted fiduciary to the law firm [and] *presume* that [Adams] received confidential information from them and automatically disqualify the firm." Joe asserted that Adams's declaration that he had not received any confidential information from Ryan was entirely insufficient in light of the imputed conflict and lengthy exchange of confidential communications and work product (based on the privilege log), while Adams "knew Ryan was Joe's lawyer and in an undisclosed (to Joe) personal relationship with [Ryoo]." Although he disputed the substance of the Adams declaration, Joe did not file any evidentiary objections to it.

### D. Trial Court Order

The trial court denied Joe's disqualification motion in a written order filed on August 8, 2022 (order). Regarding Joe's allegations against Ryan, the trial court explained they were not "material to the disqualification issues at hand." The court found that Joe's counsel provided "no evidence" that Ryan was romantically involved with Ryoo. It determined that, regardless of the factors motivating Ryan to " 'switch[] sides' " (as asserted by Joe), Ryan's alleged motivation was not material to the disqualification analysis. The court found that Joe's other allegations against Ryan, including relating to a 2018 State Bar suspension based on unethical conduct in a federal case in Massachusetts and the pending California State Bar investigation (arising from the complaint lodged by Joe), were not determinative or material, especially because the court was "not relying on Mr. Ryan's representations (e.g., in the Ryan Declaration) in deciding this motion."

The trial court further found that Joe had not demonstrated a legal or factual basis to disqualify JMBM or Adams. It noted that, absent the involvement of Ryan, there was

no basis to disqualify Adams under either a concurrent or simultaneous representation theory. Regarding the purported disclosure of confidential information, the court found there was no evidence either that Adams solicited confidential or attorney-client privileged information from Ryan or that Ryan provided such information. The trial court credited the declaration of Adams that he had not sought any confidential information about Joe, finding it had "no reason not to trust these representations." It found Joe's speculation about the communications insufficient to justify attorney disqualification. The trial court observed that while Joe asserts the Ryan declaration did reveal confidential information, that issue was "hotly disputed by the parties" and, in any event, "these supposedly-problematic disclosures were not so clearly privileged so [as] to put Mr. Adams on notice that Mr. Ryan was allegedly violating his fiduciary duty toward Joe."

The trial court also rejected Joe's argument based on submission of the JMBM privilege log. It found the inclusion of such "prototypical attorney work product (i.e., attorney interviews)" in a privilege log to be unremarkable and not an indication that the conversations "somehow involved attorney-client privileged information about Joe." For similar reasons, the court found Joe's theory of disqualification based on JMBM's alleged misuse of confidential information to be unsupported. The court based this determination on the standard set forth in *State Compensation Ins. Fund v. WPS*, *Inc.* (1999) 70 Cal.App.4th 644, 656 (*State Fund*) for disqualification of an attorney who receives information that " 'obviously appear[s]' to be privileged or confidential" and on the court's acceptance of Adams's representation that he received no such information.

Joe timely appealed from the order denying his motion to disqualify JMBM. Joe simultaneously filed a petition for writ of mandate challenging the order denying the disqualification motion and a stay request. This court summarily denied the writ petition on January 12, 2023.

9

## II. DISCUSSION

Joe contends the trial court erred in failing to disqualify JMBM and Adams based on the theory that Ryan's conflict of interest is imputed to the law firm. Joe also contends that public policy requires disqualification of a law firm where it knowingly and intentionally uses its client's adversary's lawyer as a witness against the adversary.

In response to the filing of the appeal, respondents filed a motion to dismiss the appeal as moot based on Joe having subsequently waived his privileged communications with Ryan. Respondents separately contend that the circumstances of this case do not support disqualification under any theory of concurrent or successive adverse representation. They assert that Joe's alternative theories based on vicarious disqualification or public policy have no application here, where there is no evidence that Adams received or relied upon privileged or confidential information.

In addition to these arguments, shortly after the filing of respondents' brief, counsel for respondents noticed the substitution of attorney Jennifer L. Keller for Adams as to both Ryoo and the entity defendants. Joe addresses the substitution of attorney in his reply brief and in the accompanying request for judicial notice.[5] He contends that even though Adams has withdrawn as counsel of record, the appeal is not moot and he may suffer continuing harm absent resolution of the disqualification question.

*A. Mootness*

We first consider mootness, raised by Joe in connection with respondents' substitution of counsel and by respondents in their motion to dismiss. Although respondents have not directly addressed the mootness question raised in Joe's reply brief,

---

[5] We grant in part Joe's unopposed request for judicial notice in support of his reply brief, which asks this court to take notice of the same substitution of attorney filed in the trial court, dated June 6, 2023, as well as an unrelated order of the trial court dated June 20, 2023. We grant the request as to exhibit 1, the copy of the substitution of attorney withdrawing Adams as counsel of record for Ryoo. We deny the request as to exhibit 2, which is not relevant to the resolution of this appeal.

10

the court may examine on its own motion whether an issue has been rendered moot. (*Building a Better Redondo, Inc. v. City of Redondo Beach* (2012) 203 Cal.App.4th 852, 865 (*Better Redondo*).)

In general, " 'an appellate court will decide only actual controversies and [ ] a live appeal may be rendered moot by events occurring after the notice of appeal was filed. We will not render opinions on moot questions or abstract propositions, or declare principles of law which cannot affect the matter at issue on appeal.' " (*Better Redondo*, *supra*, 203 Cal.App.4th at p. 866.)  A case is rendered moot only "when the decision of the reviewing court 'can have no practical impact or provide the parties effectual relief. [Citation.]' [Citation.]  'When no effective relief can be granted, an appeal is moot and will be dismissed.' " (*MHC Operating Limited Partnership v. City of San Jose* (2003) 106 Cal.App.4th 204, 214.)  We will not dismiss an appeal "where, despite the happening of the subsequent event, there remain material questions for the court's determination." (*Eye Dog Foundation v. State Board of Guide Dogs for Blin*d (1967) 67 Cal.2d 536, 541 (*Eye Dog Foundation*).)  Furthermore, "[e]ven when a case is moot, courts may exercise their 'inherent discretion' to reach the merits of the dispute." (*In re D.P.* (2023) 14 Cal.5th 266, 282.)

### 1.  Substitution of Counsel

Joe contends that he may suffer continuing harm absent resolution of the disqualification question.  He argues that even though neither Adams nor JMBM currently represents Ryoo or the entity defendants, Adams and JMBM have a duty to cooperate with the transfer of the matter to new trial counsel.  Pursuant to this duty, Adams may continue to share information obtained from Ryan with respondents' new counsel.  Joe also points out that Adams may substitute back into the case again at any

point (as has occurred before).[6]  Furthermore, Joe asserts that because Ryan continues to represent K & L Supply in other matters—a fact Adams used to justify his communications with Ryan—there remains a possibility that respondents' new trial counsel will similarly communicate with Ryan, putting Joe's confidences at risk.  Joe asserts that even if the appeal were moot, this court should exercise its discretion to consider the disqualification issue because of the substantial public interest in assuring the integrity of the bar and avoiding the potential for recurrence.

We agree for the reasons cited by Joe that the appeal is not moot.  Our review, though limited to ascertaining whether the trial court erred in denying the disqualification motion, has continuing relevance to the case due to the alleged dissemination of Joe's privileged and confidential information in this matter (which, if shown to have occurred, could require remedial measures by the trial court).  Whether the conduct of respondents' counsel required the trial court to impute Ryan's apparent conflict of interest to JMBM and Adams and disqualify it from representing respondents in the case is therefore not a moot question or abstract proposition.  (*Better Redondo*, *supra*, 203 Cal.App.4th at p. 866.)  This is particularly true where there have been prior substitutions of attorney, and we have no basis to assume the same counsel involved in the challenged conduct will not reengage with their former clients.

We turn to respondents' motion to dismiss on other mootness grounds.

### 2.  Motion to Dismiss

In response to the filing of the appeal, respondents filed a motion to dismiss the appeal as moot, and Joe filed a response to the motion to dismiss.  Respondents then sought leave to file a reply to the motion to dismiss, and Joe filed a conditional request

---

[6] The record on appeal shows that in May 2022, counsel for Ryoo filed a substitution of attorney, replacing Adams with attorney James R. Cummins.  Counsel filed another substitution of attorney less than two weeks later, substituting Adams back into the case.

for leave to file a sur-reply. This court ordered the rulings on both the motion to dismiss and the requests for leave to file a reply and sur-reply deferred for consideration with the appeal.

Respondents contend that the appeal has become moot due to waiver of the attorney-client privilege. According to the motion to dismiss and accompanying declaration of respondents' counsel, after filing the appeal in this matter but before filing his opening brief, Joe's counsel Andrew August (August) took the deposition of Joe's former attorney Ryan. In that deposition, August stated on the record that Joe " 'knowingly, intentionally waived the privilege between Mr. Ryan and himself as to the matters in this case.' "

Respondents argue that as a result of this express and voluntary waiver, there "no longer is *any actual controversy*" with respect to the sole basis for the disqualification motion. Respondents characterize the basis of the motion as Adams's alleged, improper receipt of Joe's privileged information from Ryan and use of that privileged information in Ryoo's defense. Respondents assert that under the relevant mootness principles, the appeal is moot because the waiver eliminates any claim of privilege over Joe's communications with his former attorney Ryan as to matters in this case and, consequently, any claimed ethical violation related to Adams's alleged receipt of such information from Ryan.

Joe counters that the motion to dismiss attempts to avoid review of the important legal issues presented on appeal. He asserts the motion to dismiss seeks to confine the ethical violations at issue to Ryan's alleged disclosure of attorney-client privileged information when, in fact, the motion raises broader issues relating to information sharing between counsel when the attorneys are not formally affiliated and to public trust in the integrity of the bar. Joe asserts that it would be inappropriate to dismiss the appeal when there remain questions ripe for determination on which this court may still grant him effectual relief. Joe also challenges the alleged effect of the waiver where its validity,

13

scope, voluntariness, and retroactive effect, if any, have yet to be litigated in the trial court.

We agree with Joe that the appeal should not be dismissed as moot on this ground. The appeal challenges the trial court's application of the doctrine of vicarious disqualification. The basis for disqualification, as presented in the motion and on appeal, is two-fold. Joe asserts that Adams improperly obtained and used attorney-client privileged information gained from the adversary's lawyer, Ryan. Joe also asserts that Adams and JMBM enabled the breach of Ryan's fiduciary obligations, exposing Joe's private confidences to his lawyer and damaging public confidence in the integrity of the bar.

Although the arguments on appeal are largely premised on Adams's purported collusion with Ryan to disclose confidential or privileged information about Joe, resolution of the appeal does not depend solely on the specific existence or exchange of attorney-client privileged information. Even if we were to assume the validity and effect of August's postappellate waiver of Joe's attorney-client privilege with Ryan as to the matters in this case, the presence of the waiver would not render moot all questions raised in the appeal. On the contrary, there would "remain material questions for the court's determination." (*Eye Dog Foundation*, *supra*, 67 Cal.2d at p. 541.)

What is more, any determination by this court concerning mootness would presuppose the legal validity of the waiver as well as its scope and retroactive impact. Respondents' motion to dismiss does not discuss these issues and has offered no legal authority in support of the purported retroactive waiver of privilege such as would apply to Ryan's alleged, prior disclosure of attorney-client privileged communications. Nor does the motion to dismiss reference August's e-mail to Ryan's counsel prior to the deposition outlining in more detail the proposed scope of Joe's intended waiver as limited to specific issues that would be addressed in the deposition. These issues have not been litigated in the trial court, and we decline to address their merits for the first time here.

14

We therefore deny respondents' motion to dismiss the appeal and the application for leave to file a reply in support of the motion to dismiss. We likewise deny Joe's responsive application for leave to file a sur-reply.

We turn to the merits of the disqualification motion.

*B. Disqualification*

Joe maintains that this case "presents a serious if not existential challenge to existing law governing vicarious disqualification of counsel." He asserts it affords "unscrupulous lawyers" a loophole to the vicarious disqualification doctrine simply because the conflicted attorney is not "formally affiliated" with the adverse client's counsel and the "only thing" the adverse client's counsel must do to avoid disqualification is "aver under oath that he or she did not *actually* receive confidential information and assert the attorney-client privilege." Joe takes issue with the trial court's failure to explicitly address Ryan's conflict of interest and its willingness to credit Adams's declaration. Joe also challenges the court's exercise of discretion applying the laws and principles governing disqualification to conclude there was no legal basis on the record before it to impute Ryan's conflict of interest to Adams and JMBM.

1. Standards of Review

An order disqualifying counsel is generally reviewed for abuse of discretion. (*In re Charlisse C.* (2008) 45 Cal.4th 145, 159 (*Charlisse C.*); *The People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1143 (*SpeeDee Oil*).) Under this standard, we review a trial court's factual findings for substantial evidence and its conclusions of law de novo. (*Charlisse C.*, at p. 159.) In other words, "[i]f the trial court resolved disputed factual issues, the reviewing court should not substitute its judgment for the trial court's express or implied findings supported by substantial evidence. [Citations.] . . . [W]here there are no material disputed factual issues, the appellate court reviews the trial court's determination as a question of law." (*SpeeDee Oil*, at pp. 1143–1144.) The court's ultimate decision based

on its application of law to the facts is reversible only if arbitrary and capricious. (*Charlisse C.*, at p. 159; see *Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 712 (*Haraguchi*).)  Even so, because a disqualification motion implicates special concerns about the administration of justice and a party's right to choose counsel, a careful review of the trial court's exercise of discretion is warranted.  (*SpeeDee Oil*, at p. 1144.)

### 2.  Governing Legal Principles

Under California law, every court has the authority "[t]o control in furtherance of justice, the conduct of its ministerial officers, and of all other persons in any manner connected with a judicial proceeding before it, in every matter pertaining thereto."  (Code Civ. Proc., § 128, subd. (a)(5).)  The court's power to disqualify an attorney derives from that authority.  (*SpeeDee Oil*, *supra*, 20 Cal.4th at p. 1145.)  "Ultimately, disqualification motions involve a conflict between the clients' right to counsel of their choice and the need to maintain ethical standards of professional responsibility."  (*Ibid*.)  The court's "paramount concern must be to preserve public trust in the scrupulous administration of justice and the integrity of the bar."  (*Ibid*.)  Other considerations might include "a client's right to chosen counsel, an attorney's interest in representing a client, the financial burden on a client to replace disqualified counsel, and the possibility that tactical abuse underlies the disqualification motion."  (*Ibid*.)

"Two ethical duties are entwined in any attorney-client relationship.  First is the attorney's duty of confidentiality, which fosters full and open communication between client and counsel, based on the client's understanding that the attorney is statutorily obligated [citation] to maintain the client's confidences.  [Citation.]  The second is the attorney's duty of undivided loyalty to the client.  [Citation.]  These ethical duties are mandated by the California Rules of Professional Conduct.  (Rules Prof. Conduct, [former] rule 3–310(C) & (E).)"  (*City and County of San Francisco v. Cobra Solutions, Inc.* (2006) 38 Cal.4th 839, 846 (*Cobra*).)  It is the "interplay of the duties of

16

confidentiality and loyalty" that affect the conflict of interest rules governing attorneys and guiding disqualification decisions.  (*Ibid.*)

The California Supreme Court has described two factual contexts ("successive representation" and "simultaneous representation") in which conflicts of interest commonly arise.  (See *Charlisse C.*, *supra*, 45 Cal.4th at pp. 159–160.)

Successive representation arises "where an attorney seeks to represent a client with interests that are potentially adverse to a former client of the attorney."  (*Charlisse C.*, *supra*, 45 Cal.4th at p. 159.)  In those circumstances, "the chief fiduciary value jeopardized is that of client confidentiality."  (*Flatt v. Superior Court* (1994) 9 Cal.4th 275, 283, italics omitted (*Flatt*).)  "Where an attorney successively represents clients with adverse interests, and where the subjects of the two representations are substantially related, the need to protect the first client's confidential information requires that the attorney be disqualified from the second representation."  (*SpeeDee Oil*, *supra*, 20 Cal.4th at p. 1146.)  "For the same reason, a presumption that an attorney has access to privileged and confidential matters relevant to a subsequent representation extends the attorney's disqualification vicariously to the attorney's entire firm."  (*Ibid*.)

By contrast, in simultaneous representation cases, "an attorney seeks to represent in a single action multiple parties with potentially adverse interests."  (*Charlisse C.*, *supra*, 45 Cal.4th at p. 159.)  "The primary value at stake in cases of simultaneous or dual representation is the attorney's duty—and the client's legitimate expectation—of loyalty, rather than confidentiality."  (*Flatt*, *supra*, 9 Cal.4th at p. 284, italics omitted.)  "An attorney who seeks to simultaneously represent clients with directly adverse interests in the same litigation will be automatically disqualified."  (*Cobra*, *supra*, 38 Cal.4th at p. 846; see *Flatt*, at p. 284 ["[I]n all but a few instances, the rule of disqualification in simultaneous representation cases is a per se or 'automatic' one."].)

The principle of vicarious disqualification, governing when an attorney's personal conflict will be imputed to the attorney's law firm resulting in its vicarious

17

disqualification, was strictly "a product of decisional law" (*Cobra*, *supra*, 38 Cal.4th at p. 847) prior to its inclusion in the California Rules of Professional Conduct, effective 2018. Rule 1.10 on imputation of conflicts of interest generally prohibits lawyers "associated in a firm" from "knowingly represent[ing] a client when any one of them practicing alone would be prohibited from doing so" under the rules governing conflicts of interests involving current and former clients. (Rules Prof. Conduct, rule 1.10.) The rationale behind vicarious disqualification, as expressed by the California Supreme Court is that " 'attorneys, working together and practicing law in a professional association, share each other's, and their clients', confidential information.' " (*Cobra*, at p. 848, quoting *SpeeDee*, *supra*, 20 Cal.4th at pp. 1153–1154, fn. omitted.)

An order on a motion to disqualify counsel is directly appealable. (*Jarvis v. Jarvis* (2019) 33 Cal.App.5th 113, 128.)

### 3. Substantial Evidence of Facts Supporting Disqualification

Beginning with the standard of review, Joe acknowledges the deferential standard generally applicable to orders on disqualification motions but argues that the "legal principles applicable to th[is] case limit that discretion." Joe contends that the trial court failed to apply the rules governing imputed conflicts of interest and vicarious disqualification and instead relied exclusively on Adams's declaration asserting that he had not sought to obtain any confidential information from Ryan. Joe characterizes the trial court's reliance on the Adams declaration as "clear legal error." He also describes the facts underlying the disqualification issue as undisputed, or unable to be disputed because of JMBM's improper assertion of work product and attorney-client privilege. Joe therefore contends that this court's appellate review should be de novo.

In deciding the disqualification motion, the trial court resolved at least some questions of disputed material facts. Admittedly, certain facts are not disputed, such as Ryan's attorney-client relationship with Joe and as counsel for K & L Supply, his role as counsel of record in Joe's divorce action when JMBM proffered the Ryan declaration in

this action (though he has since withdrawn), and the numerous communications between Ryan and Adams reflected by the JMBM privilege log. However, other factual issues, such as whether Ryan shared Joe's confidences with Adams, were (in the words of the trial court) "hotly disputed." The trial court's decision in this matter comprised factual findings as well as the application of law to facts. As such, our review consists of a mixed standard of deference, in which we review factual findings for substantial evidence, any conclusions of law de novo, and the trial court's decision on disqualification for abuse of discretion. (*Charlisse C.*, *supra*, 45 Cal.4th at p. 159; *Haraguchi*, *supra*, 43 Cal.4th at p. 712.)

When we review a factual finding decided adverse to the party with the burden of proof, to overcome the adverse determination the appellant must demonstrate no other factual conclusion is possible, e.g., that " 'the evidence compels a finding in favor of the appellant as a matter of law.' " (*Ajaxo, Inc. v. E\*Trade Financial Corporation* (2020) 48 Cal.App.5th 129, 163 (*Ajaxo*).) That is, where " 'the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals, it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment.' " (*Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 465.) Instead, " 'where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." ' " (*Id.* at p. 466.)

The trial court's findings include its determination that Adams had not solicited attorney-client privileged or confidential information from Ryan and that Ryan "did not provide such information (or at least did not do so in an obvious way)." The finding is

supported by Adams's declaration describing the nature of his outreach to Ryan for background information on the intertwined family and litigation history. Joe raised no evidentiary objections to the Adams declaration, and the trial court was entitled to rely upon it. The trial court similarly was entitled to consider the court's earlier ruling rejecting respondents' application to file the Ryan declaration in assessing the effect of the declaration on respondents' choice of counsel.

We see no basis to reject the trial court's characterization of the JMBM privilege log as "prototypical attorney work product." Joe disputes this finding, arguing it ignores that Adams worked closely with Ryan on Ryoo's defense, "exchanging [] more than 100 attorney-client privileged communications" between them. Joe asserts that the trial court disregarded the obvious implications of Ryan's lengthy history representing Joe, his declaration which publicly disclosed facts "that only he, as Joe's lawyer, would be privy to," and his extensive exchange of e-mails and e-mail attachments with JMBM over a three-month period between October 2021 and January 2022, as evidenced by JMBM's privilege log. While the history of exchanges between Ryan and Adams arguably establishes Adams's *theoretical* access to confidential information, the relevant standard—as discussed in more detail *post* (pt. II.B.4.), is that of a reasonable probability of disclosure. (*McDermott Will & Emery LLP v. Superior Court* (2017) 10 Cal.App.5th 1083, 1120 (*McDermott*); *Adams v. Aerojet-General Corp.* (2001) 86 Cal.App.4th 1324, 1340 (*Adams*); *Gregori v. Bank of America* (1989) 207 Cal.App.3d 291, 305 (*Gregori*).)

Joe asks us to draw inferences from the record that might discredit Adams's sworn declaration of his interactions with Ryan or suggest a breach of client confidentiality. But our review is limited to whether the evidence compels a finding in favor of the appellant as a matter of law. Joe's arguments fall short of this standard.

Joe argues that under *Shadow Traffic Network v. Superior Court* (1994) 24 Cal.App.4th 1067 (*Shadow Traffic*), the trial court should have discredited the Adams declaration, which Joe characterizes as "factually meager, conclusory, and

20

uncorroborated." Rather than assist Joe, however, *Shadow Traffic* merely illustrates application of the substantial evidence standard in a case involving confidential disclosures that precipitated a motion for attorney disqualification. The disqualification in *Shadow Traffic* arose from the defense counsel's retention of the accounting firm Deloitte & Touche (Deloitte) as its expert witness even though Deloitte's partners had previously met with and discussed the case with the plaintiff's law firm. (*Id*. at p. 1071.) Several declarations offered in support of the plaintiff's disqualification motion described the confidential information its lawyers provided to Deloitte's partners during their preliminary discussions about retaining Deloitte as their expert. These disclosures included the plaintiff's legal theories for the case as well as trial strategies and expected deliverables. (*Id*. at pp. 1073–1074.) In opposing the disqualification motion, the defendant's law firm initially offered a single declaration of one attorney who denied having asked for or received any information from Deloitte about its partners' prior discussions with the plaintiff's lawyers. (*Id*. at p. 1074.) The trial court ultimately granted the disqualification motion, finding that confidential information imparted by the plaintiff's law firm to Deloitte had been conveyed to the defense attorneys. (*Id*. at pp. 1075, 1078, fn. 7.) The appellate court concluded there was substantial evidence to support the trial court's order and affirmed. (*Id*. at pp. 1083, 1088–1089.)

Joe compares Adams's declaration averring that he never asked for and Ryan never provided any of Joe's confidential information to that of the defense counsel's declaration in *Shadow Traffic* denying any receipt of confidential information. (*Shadow Traffic*, *supra*, 24 Cal.App.4th at pp. 1086–1087.) Joe asserts that, like in *Shadow Traffic*, Adams's "self-serving" declaration is insufficient to rebut the presumption of disclosure that otherwise arises from the facts surrounding Ryan's submission of a declaration against the interest of his existing client, Joe, and his extensive communications with Adams about this dispute.

21

Joe's argument overlooks a critical distinction between this case and *Shadow Traffic*. In *Shadow Traffic*, the party seeking disqualification provided robust evidence that the plaintiff provided confidential information to the prospective expert witness on the plaintiff's litigation strategy as to the specific issue (damages) about which the expert witness then consulted with the defendant's attorneys. (*Shadow Traffic*, *supra*, 24 Cal.App.4th at pp. 1073–1074.) To the extent that the declarations submitted in opposition to the disqualification motion created a conflict in the evidence, the trial court resolved the conflict in favor of the plaintiff, and the appellate court upheld that decision as supported by substantial evidence in the record. (*Id*. at pp. 1083–1084.)

By contrast, the only declaratory evidence here concerning the alleged disclosure of confidential information is that supplied by Adams, who, according to the privilege log, was the only JMBM attorney in communication with Ryan. Joe has not pointed us to any evidence in the record that would compel the trial court to conclude that the exchanges listed in the JMBM privilege log themselves disclosed Joe's privileged or confidential information, nor that supports an inference of reasonable probability that Joe's privileged or confidential information was thereby disclosed. (*Ajaxo*, *supra*, 48 Cal.App.5th at p. 163.) Insofar as the trial court found the Adams declaration trustworthy and otherwise found no direct evidence of Ryan's purported disclosure of Joe's confidential or attorney-client privileged information, this court's review—like that of the appellate court in *Shadow Traffic*—is limited to ascertaining whether substantial evidence in the record supports the trial court's findings, or whether evidence in the record compels a contrary conclusion. We conclude that nothing in the record compels factual conclusions contrary to those reached by the trial court.[7]

---

[7] Our conclusion that there is sufficient evidence in the record to support the trial court's finding that Adams did not solicit confidential information from Ryan should not be construed as condoning the propriety of Ryan's submission of a declaration in this action or of JMBM's attempt to file that declaration with the court.

4. <u>Imputing Conflict of Interest to Adams and JMBM</u>

We turn to Joe's contention that, under applicable principles of imputed conflict of interest and vicarious disqualification, Ryan's personal conflict of interest must be imputed to JMBM and its attorneys. This argument does not depend upon the trial court's resolution of disputed facts and inferences. Instead, it requires us to assess, as a question of law, "the legal significance of the undisputed facts in the record" (*SpeeDee Oil*, *supra*, 20 Cal.4th at p. 1144), including Ryan's attorney-client relationship with Joe, his extensive correspondence with Adams as reflected in the JMBM privilege log, and his submission of declaratory testimony in support of Ryoo's opposition to Joe's application for preliminary injunction.

The premise of Joe's disqualification argument proceeds in two steps. First, Joe avers that Ryan's longstanding representation of him establishes a disqualifying personal conflict of interest as to Ryan under both simultaneous (concurrent) and successive representation theories of disqualification. Second, Joe contends that because Ryan is conflicted under either analytical framework, his conflict of interest must be imputed to JMBM and Adams under the principle of vicarious disqualification due to their joint conduct in this litigation.

Respondents dispute the applicability of the simultaneous/successive adverse representation framework, as Ryan does not represent any party in this action, and neither JMBM nor Adams was ever previously counsel to (or adverse to) Joe or to other individuals in the action. Respondents also argue that Joe's simultaneous and successive representation arguments ignore Ryan's and Adams's respective representation of K & L Supply, and that Ryan previously represented K & L Korea, one of Adam's clients in this case, providing an appropriate basis for cooperation in this case. Respondents further argue that Joe's effort to disqualify *Adams* and JMBM based on allegedly wrongful conduct by *Ryan* represents a "contortion[]" of the rule of imputed conflict of interest and vicarious disqualification, whose application is clearly delineated by case authority.

23

We agree with respondents that Joe has not shown error in the trial court's decision to deny his motion for disqualification.

As to step one (Ryan's personal conflict of interest), it is undisputed that Ryan was still counsel of record in the divorce action (which had settled but was pending entry of final judgment) when JMBM filed the Ryan declaration in this action.[8] Ryan also previously counseled Joe on the subject of Ryoo's alleged undue influence over him (the same contention asserted by Joe in this case) while representing Joe in the conservatorship filed by Julia in 2014. Nevertheless, Joe cannot show that Ryan's conduct provides a paradigmatic example of prohibited dual representation. (Cf. *Flatt*, *supra*, 9 Cal.4th at p. 285.) Although Ryan cooperated with opposing counsel in this case while still representing Joe in his divorce action, there appears to be no authority for the proposition that such cooperation, as a matter of law, equates to representation. Indeed it is when an attorney "seeks to simultaneously *represent* clients with directly adverse interests in the same litigation" (*Cobra*, *supra*, 38 Cal.4th at p. 846, italics added) that the principles of automatic disqualification apply. (*Ibid*.; *Flatt*, at p. 284.)

So, too, there is little question that Ryan's longtime representation of Joe in prior litigation, including the conservatorship case involving substantially similar claims, would satisfy the " ' "substantial relationship" ' " test used to determine presumptive possession of confidential information relevant to the disqualification inquiry in successive representation cases. (See *Cobra*, *supra*, 38 Cal.4th at p. 847; *Flatt*, *supra*, 9 Cal.4th at p. 283.) However, the "successive" element of successive representation is lacking because Ryan does not represent the party adverse to Joe in the current litigation. (*SpeeDee Oil*, *supra*, 20 Cal.4th at p. 1146 [requiring disqualification from a second representation "[w]here an attorney successively *represents* clients with adverse interests, and where the subjects of the two representations are substantially related"].)

---

[8] On March 24, 2022, the trial court in the divorce action granted Ryan's request to withdraw as Joe's counsel of record.

24

Joe addresses these points by asserting that where there is no reasonable dispute Ryan would be disqualified from *formally* representing respondents or acting as cocounsel to Adams in this matter under both a concurrent and successive representation analysis, the same logic must apply to Ryan's *informal* association with JMBM and Adams. He variously asserts, as to step two (imputing Ryan's conflict of interest to Adams and JMBM), that Ryan was "[e]ffectively JMBM's '[c]o-counsel' " and that his conduct was "tantamount to Ryan acting as [Ryoo]'s *de facto* lawyer and JMBM's co-counsel while still Joe's divorce lawyer." Joe likewise asserts that JMBM and Adams "essentially deputized Ryan as one of their own" by enlisting him to oppose Joe's preliminary injunction application and by using his declaration to counter Joe's lawyer's statements at the preliminary injunction hearing. He maintains that "there is no discernable difference" between Ryan serving as a *witness* for respondents and him acting as their cocounsel. In short, Joe asserts that "the tripartite relationship" between Ryan, Adams/JMBM, and Ryoo "was the practical equivalent of Ryan and JMBM being co-counsel." Hence, Joe contends that under the rules extending attorney disqualification due to an ethical conflict to the attorney's entire firm (*Cobra*, *supra*, 38 Cal.4th at pp. 847–848; *SpeeDee Oil*, *supra*, 20 Cal.4th at p. 1139), Ryan's conflict of interest must be imputed to Adams and JMBM.

We disagree that such a logical leap is supported in this case. In a standard application of vicarious disqualification, courts impute an attorney's conflict of interest to the law firm employing that individual. (See, e.g., *National Grange of Order of Patrons of Husbandry v. California Guild* (2019) 38 Cal.App.5th 706, 709 [disqualification affirmed based on law firm's hiring of an attorney who had previously worked for a firm representing the adverse party in the same case].) The rationale underlying the rule is " 'that attorneys, working together and practicing law in a professional association, share each other's, and their clients', confidential information.' " (*Cobra*, *supra*, 38 Cal.4th at pp. 847–848; *SpeeDee Oil*, *supra*, 20 Cal.4th at pp. 1153–1154.) This rationale is

25

grounded in the recognition that attorneys who practice together in a firm "presumptively share access to privileged and confidential matters." (*SpeeDee Oil*, at p. 1153.) Some courts have extended this application where an *employee* of the attorney against whom disqualification is sought possessed confidential attorney-client information materially related to the proceedings before the court. (See *In re Complex Asbestos Litigation* (1991) 232 Cal.App.3d 572, 579 [disqualification affirmed after lead counsel law firm in nine asbestos-related personal injury actions employed paralegal who had previously been employed by opposing counsel and had worked on asbestos cases].)

Joe's argument to extend this principle to an attorney who is *not* in any employment or fiduciary relationship with JMBM rests on the assumption that Ryan's conduct—both in communicating with Adams over a three-month period and in submitting the Ryan declaration for JMBM's use in this litigation—is *tantamount* to Ryan having associated as cocounsel or of counsel to JMBM in this case. Joe likewise argues that Adams used Ryan as de facto cocounsel by enlisting his assistance in defending against Joe's action and enabled Ryan's violation of one or more ethical duties to Joe.

Joe offers no legal authority to support the proposition that Ryan's communications with Adams in the context of this dispute, including his submission of a declaration for filing with the court, qualified him as an associate of JMBM for disqualification purposes. Even if we were to assume *arguendo* that Ryan's conduct independently violated the rules of professional conduct and breached his fiduciary duties to Joe, Joe has not provided any persuasive basis to conclude that Ryan's interactions with Adams and JMBM rendered him their associate for purpose of the disqualification analysis. Indeed, Joe concedes that "there is no reported disqualification case [] where the tainted source of the confidential information is the moving party's own current lawyer who, though not formally associated with the firm whose disqualification is sought, effectively acted as such."

26

In considering this proposition, we consider the concerns that animate the imputation of conflicts of interests between affiliated lawyers. (See Rest.3d Law Governing Lawyers, § 123. com. b [describing "three concerns" reflected in imputation of conflicts of interest to affiliated lawyers].) These concerns include that lawyers in a law firm or other affiliation may share financial interests, may have access to each other's confidential client information, and may have superior access to what was disclosed, given the challenge faced by a client seeking to demonstrate a misuse of confidential information by their former counsel without revealing the very information the client seeks to protect. (*Ibid.*) Joe does not suggest an improper financial incentive or shared financial interest (nor does the record reflect a basis for such concern). There is also no evidence to suggest Adams had access to Ryan's confidential files. Instead, Joe focuses on the informal affiliation between Ryan and Adams as the basis for presuming disclosure of confidential information. While there appears to be no published California case authority addressing the type of informal cooperation that appears to have occurred here, in evaluating whether the cooperation between Adams and Ryan supports a basis to impute Ryan's conflict of interest, we take guidance from the California Supreme Court's decision to apply the vicarious disqualification rule in the context of a more formal, of counsel attorney relationship. (*SpeeDee Oil*, *supra*, 20 Cal.4th at pp. 1153–1154.)

In *SpeeDee Oil*, our high court extended imputed disqualification to an attorney affiliated with a firm as of counsel based on the close relationship between the firm's members. "The close, personal, continuous, and regular relationship between a law firm and the attorneys affiliated with it as of counsel contains many of the same elements that justify the rule of vicarious disqualification applied to partners, associates, and members. An of counsel attorney, particularly one frequently in the firm's offices or in contact with the firm's attorneys, may be consulted on a variety of matters without being formally identified as cocounsel. This close, fluid, and continuing relationship, with its attendant exchanges of information, advice, and opinions, properly makes the of counsel attorney

27

subject to the conflict imputation rule, regardless of whether that attorney has any financial stake in a particular matter." (*SpeeDee Oil*, *supra*, 20 Cal.4th at p. 1154.)

*SpeeDee Oil* reinforces our determination that Ryan's conduct is not equivalent to an "of counsel" affiliation. Contrary to Joe's speculation about the nature of the exchanges documented in the JMBM privilege log, the record reflects no such "close, fluid, and continuing relationship" between Ryan and Adams or JMBM with respect to the representation of Ryoo and the entity defendants in this case. (Cf. *SpeeDee Oil*, *supra*, 20 Cal.4th at p. 1154.) To the contrary, the trial court found there was no evidence of any exchange or receipt of confidential material such as might suggest such a "close, fluid" relationship. For similar reasons, we reject Joe's unsupported assertion that Ryan "had at least a quasi-fiduciary relationship with JMBM as shown in the [p]rivilege [l]og."

Of course, vicarious disqualification of a law firm may be appropriate even when the source of confidential information is not an employee or formal affiliate of the challenged law firm. (See *O'Gara Coach Co., LLC v. Ra* (2019) 30 Cal.App.5th 1115, 1126 ["Attorney disqualification to support the fundamental principle of protecting client confidences is not limited to situations in which an adversary's privileged communications have been acquired through a prior attorney-client relationship."].) Joe points out that disqualification can occur when the source of client confidential information is a corporate officer of one of the litigants, or an expert witness. Joe asserts that the touchstone for applying the rule of vicarious disqualification is the potential access to confidential information that the law firm has by virtue of its relationship with the conflicted lawyer (or, in some instances, non-lawyer).

While this assertion is partially correct, the access to confidential information may not be purely theoretical; rather, " 'disqualification is proper where, as a result of a prior representation or through improper means, there is a reasonable probability counsel has obtained information the court believes would likely be used advantageously against an adverse party during the course of the litigation.' " (*McDermott*, *supra*, 10 Cal.App.5th at

p. 1120; cf. *Adams*, *supra*, 86 Cal.App.4th at p. 1340 [concluding "disqualification should not be ordered where there is no reasonable probability the firm-switching attorney had access to confidential information while at his or her former firm that is related to the current representation"]; *Gregori*, *supra*, 207 Cal.App.3d at p. 305 [rejecting presumption that confidential information passed between law firm partner who engaged in an undisclosed dating relationship with legal secretary from law firm representing the opposing party and reasoning that "the scant evidence in the record does not create a reasonable probability that important information regarding the lawsuit was divulged"].)

"Since the purpose of a disqualification order must be prophylactic, not punitive, the significant question is whether there exists a genuine likelihood that the status or misconduct of the attorney in question will affect the outcome of the proceedings before the court." (*Gregori*, *supra*, 207 Cal.App.3d at pp. 308–309.) The trial court found that there was no substantial evidence either that Adams solicited confidential information or attorney-client communications from Ryan or that Ryan provided such information. We agree that substantial evidence in turn supports the trial court's conclusions, and there is no evidence in the record to compel a contrary conclusion. On this factual record, we decide the facts presented do not provide a sufficient factual predicate for imputing Ryan's knowledge of Joe's confidential information to Adams and JMBM.

Joe's further reliance on the *State Fund* doctrine for attorney receipt of privileged and confidential information only reinforces our conclusion. In *State Fund*, *supra*, 70 Cal.App.4th 644, the Court of Appeal articulated an attorney's ethical obligations upon receiving another party's privileged information. In *Rico v. Mitsubishi Motors Corp.* (2007) 42 Cal.4th 807 (*Rico*), the California Supreme Court approved the *State Fund* standard and extended it to the receipt of attorney work product. (*Id.* at pp. 817–818.) An attorney who inadvertently receives materials "that obviously appear" (*State Fund*, at p. 656) to be subject to an attorney-client privilege or otherwise privileged may not

29

examine the document more closely than is needed to ascertain that it is privileged and must "immediately notify" the document's sender and try to resolve the situation. (*Ibid*.) (Accord, *Rico*, at p. 810.) Under these authorities, " ' "[m]ere exposure" ' to an adversary's confidences is insufficient, standing alone, to warrant an attorney's disqualification." (*Rico*, at p. 819.) However, " 'disqualification might be justified' " if an attorney in receipt of such materials fails to follow the standard and " 'assuming other factors compel disqualification.' " (*Ibid*.) *Rico* illustrates such circumstances. There, the high court affirmed the disqualification of counsel who had acquired opposing counsel's notes related to the case and " 'also acted unethically in making full use of the confidential document.' " (*Ibid*.)

Joe argues that the misconduct in this case is more egregious than the inadvertent receipt of materials discussed in *State Fund* and *Rico*, since Adams and JMBM actively solicited the information from Ryan and filed his declaration. Joe asserts that these acts "grossly violated their ethical duty as attorneys to maintain the integrity of the judicial process." However, the standards discussed in *Rico* and *State Fund* do not assist Joe here because the privileged nature of the materials obtained by counsel in those cases was readily apparent. (*State Fund*, *supra*, 70 Cal.App.4th at p. 652; *Rico*, *supra*, 42 Cal.4th at p. 810.) By contrast, the trial court resolved this disputed issue against Joe, and substantial evidence in the record supports that finding.

In sum, we conclude that Ryan's putative conflict-of-interest does not extend to Adams and JMBM under any theory of imputed, vicarious disqualification cited by Joe. Furthermore, absent evidence that Adams obtained materials "that obviously appear" privileged (*State Fund*, *supra*, 70 Cal.App.4th at p. 656) or which suggest a "reasonable probability" that Adams and JMBM obtained confidential information they would likely use advantageously against Joe during the litigation (*McDermott*, *supra*, 10 Cal.App.5th at p. 1120), there was no clear legal basis to impute Ryan's conflict of interest to Adams.

The trial court therefore did not err in declining to apply the doctrine of vicarious disqualification to Adams and JMBM.

Joe also asserts that the trial court erred by failing to address the relevant public policy factors that courts must balance when weighing disqualification. Joe contends these factors weigh heavily in favor of disqualification since both Adams and Ryan failed to maintain their ethical standards of practice and professional conduct. Joe asserts their conduct was antithetical to the "paramount concern" of courts "to preserve public trust in the scrupulous administration of justice and the integrity of the bar." (*SpeeDee Oil*, *supra*, 20 Cal.4th at p. 1145.) Because "[t]he important right to counsel of one's choice must yield to ethical considerations that affect the fundamental principles of our judicial process" (*ibid*.), Joe maintains there is no policy basis upon which to uphold the trial court's decision.

We agree that these policy principles are relevant to the court's decision whether to disqualify a party's chosen counsel after having determined that there is a legal and factual basis for disqualification. However, the policy factors are less impactful when the court finds no basis to weigh disqualification in the first instance. The evidence in the record neither mandates disqualification of Adams or JMBM as a matter of law nor establishes that the trial court abused its discretion in denying the motion for disqualification.

Our conclusion that the trial court did not err in denying Joe's motion should not be read to condone Ryan's conduct in submitting the declaration for filing or to prejudge a renewed motion for disqualification if Adams or JMBM renew their representation of respondents and new facts emerge.

### III. DISPOSITION

The order denying Joe's motion to disqualify Adams and JMBM is affirmed. Respondents are entitled to their reasonable costs incurred on appeal. (Cal. Rules of Court, rule 8.278(a)(2).)

31

_____
                                    Danner, J.


WE CONCUR:




_____
Grover, Acting P.J.




_____
Bromberg, J.




**H050465**
*Lee v. Ryoo*